IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| James Jones, ) | |
| ) | Civil Action No. 6:11-2693-HMH-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| GE Gas Turbines, LLC, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the defendant's motion for summary judgment (doc. 27). The plaintiff alleges causes of action for race discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civil Rule 73.02(B)(2)(g) DSC, all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

**FACTS PRESENTED**

The plaintiff, who is an African-American male (amended comp. ¶ 3), began his employment with GE in April 2008 (pl. dep. 19). Jamie Hill, Human Resources Manager, contacted the plaintiff about employment opportunities at GE in the Spring of 2008 (*id.*). The plaintiff was hired as the third shift Operations Leader in Rotor Machining (*id.* 21). Rotor Machining is part of the Rotor Cell (*id.*). The Rotor Cell is where the components of the gas turbine engine are actually machined and assembled (*id.* 21-22). The gas turbine engines made in the Greenville facility are used in international power plants (*id.*). The four bays that make up the Rotor Cell consist of Blades, Rotor Machining, Rotor Assembly, and Buckets (*id.* 22). In Rotor Machining, employees are making the wheel or the inside of the turbine that is going to eventually spin to move the gas turbine engine (*id.* 22-23). The plaintiff supervised approximately 30 to 40 employees on third shift

in Rotor Machining (*id.* 23; Charron dep. 16). The hourly employees working on third shift in Rotor Machining were primarily performing surface grinding, sandblasting, and "shot ping"[1] (pl. dep. 23). The machining being done in the plaintiff's department must be kept to specifications for the turbine engine to function properly (*id.*).

The daily schedule and parts that will be machined each day generate from the first shift. First shift sets the tempo for the entire work day (Charron dep. 18-19). The first shift supervisor has to be more aware of what is going on in the department because they are more involved in meetings and have more contact with sales people and other individuals in the other three bays that impact the overall machining operation on all three shifts (pl. dep. 26-27). Shift changeover meetings take place at the conclusion of each shift (*id.* 28). These shift changeover meetings normally take place in the supervisor's office (*id.*). These meetings are normally attended by the supervisors from the respective shifts, a quality person, the shift coordinator, and the COE Leader (*id.* 28-29). During these shift turnover meetings, the outgoing supervisor is responsible for informing the incoming shift supervisor about any problems or issues that occurred on the previous shift that prevented the parts from being completed on schedule (*id.*). During shift turnover from third shift to first shift, the plaintiff did the majority of the talking (*id.* 66). Likewise, during shift turnover from second shift to third shift, the second shift supervisor, Greg Weaver, did most of the talking (*id.*).

As the third shift Operations Leader, the plaintiff reported to a Cell Leader, who in turn reported to the COE Leader (pl. dep. 30). When the plaintiff began his employment in April 2008, he first reported to John Kenney, Cell Leader, and the COE Leader was Dave Sudbeck (*id.*). The COE Leader was over the entire Rotors department including all three shifts, while the Cell Leader would have been over Rotor Machining on all three shifts (*id.*). Mr. Kenney is a white male. The plaintiff stated in his deposition that he got along well with Mr. Kenney (*id.* 31).

---

[1] Phonetically transcribed for shot-peening, a machining process.

2

All Operation Leaders are not only responsible for supervising the hourly employees on their shift and ensuring production goals are met, but also are responsible for completing a certain number of projects annually (pl. dep. 31). These projects are Six Sigma projects and Nike projects. These projects are specifically tailored to the particular individual and their department and are designed to seek areas for improvement (*id.* 32). The plaintiff acknowledged that completing these projects in a timely manner was part of all Operations Leaders' job responsibilities (*id.*). The plaintiff further acknowledged that Operations Leaders were expected to know and understand the processes and products that were being produced at the Greenville facility (*id.* 33).

The defendant's performance evaluations are referred to as "EMS." The plaintiff's 2008 performance evaluation, which was prepared by John Kenney, was prepared in January 2009 (pl. dep., ex. 2). Mr. Kenney discussed the plaintiff's evaluation with him in March of 2009. The plaintiff noted in his self assessment under "Development Needs and Plans" that he needed to "increase knowledge of product, past performance issues, and capabilities" (*id.*). Mr. Kenney noted under the "Development Needs" section of the EMS the following:

> Expertise: James needs to continue to spend time with operators and Manufacturing Engineers on the floor to increase his process knowledge. In addition he would benefit from learning more about the day-to-day activities of the buyers and PQEs.
>
> External Focus: I would like to see James gain a better understanding of the entire business in addition to learning more about our direct customer, Rotor Assembly.
>
> Imagination: As his knowledge of the area grows, I'd like to see larger impact projects out of James in 2009.

(*Id.*). Under the "Career Recommendations" section of the EMS, Mr. Kenney recommended that the plaintiff "remain in his current role, and work on his development needs" (*id.*).

The plaintiff agreed with Mr. Kenney's overall assessment in the 2008 EMS and does not feel that he was discriminated against with respect to the 2008 EMS (pl. dep.

3

39-40). The plaintiff further acknowledged that his self evaluation "improvement needs" matched the "improvement needs" of his manager, Mr. Kenney (*id.* 38).

The plaintiff applied for a lateral transfer to the first shift Operations Leader position in Rotor Machining in the spring of 2009 (pl. dep. 40). He became aware of the vacancy because Mr. Guillaume Charron was promoted to Cell Leader after the current Cell Leader, Mr. Kenney, became a COE Leader in another department (*id.* 41-42). The individuals involved in filling the first shift Operations Leader position were Mr. Charron and the COE Leader, Ed Stefanik (White dep. 16; Charron dep. 19). After applying for the position, the plaintiff inquired from Mr. Charron about the vacant position, and Mr. Charron informed the plaintiff that he was not going to be interviewed for the position (pl. dep. 43-44). According to Mr. Charron, the plaintiff was not interviewed for the position because he and Mr. Stefanik did not believe that the plaintiff was ready to handle the first shift responsibilities after being at GE for less than a year, especially when he was not excelling in his current role (Charron dep. 18-20; Charron aff. ¶5). According to the plaintiff, Mr. Charron told him that he needed to keep working and doing the best he could in his current third shift position (pl. dep. 45). Mr. Charron stated in his affidavit that he chose not to interview the plaintiff so as not to lead him on about filling the vacancy (Charron aff. ¶ 5). At GE, the direct manager will decide which candidates to interview (Hill dep. 8). When filling an Operations Leader vacancy, that decision would be made by the Cell Leader and COE Leader, who were Mr. Charron and Mr. Stefanik in this case (*id.*).

Three individuals applied for the first shift Operations Leader position: the plaintiff, Greg Weaver (second shift Operations Leader), and Ashley White (Charron dep. 18). Mr. Weaver is an African-American male, and Ms. White is a white female (pl. dep. 47). While Mr. Charron did not interview the plaintiff, he did interview Ms. White and Mr. Weaver (Charron dep. 16-18). Ms. White was chosen for the first shift Operations Leader position (pl. dep. 47). The decision to hire Ms. White was made by Mr. Charron and Mr. Stefanik (Charron dep. 19; Charron aff. ¶ 5). The plaintiff did not know anything about Ms. White's background or experience at the time she was selected (pl. dep. 48). He began

4

working with her during third shift turnover meetings and stated that he had no problems with Ms. White (*id.* 47-48).

Ms. White is a 2006 graduate from Clemson University with Honors with a degree in Industrial Engineering and a minor in Mathematics (White dep. 8). Ms. White had previously been employed with the defendant as an MRP buyer for casings, bearings, and fabrications (*id.* 9-10). In her role, she primarily worked with vendors globally for purchasing and scheduling for the casing process and also the machining process (*id.* 10). She worked as an MRP buyer for approximately two years and then became Casings Fulfillment Leader. As Fulfillment Leader, she would work onsite with suppliers and vendors to review internal scheduling problems. She was attempting to improve GE's fulfillment rate and collaborate with their suppliers (*id.* 12). Ms. White also gave direction to two MRP buyers in her role (*id.* 30-31). She was in this role for approximately one year (*id.* 12-13).

According to Mr. Charron, Ms. White was selected for the position because she was the best qualified candidate based on her educational experience, past performance evaluation ratings, and the experience she had dealing with suppliers and indirectly supervising individuals as a Fulfillment Leader (Charron dep. 17-18; Charron aff. ¶ 6). Mr. Charron testified as follows:

> Q: And what led you to hire Ashley White for that position? What qualifications did she have that led you to hire her?
>
> A: A Buyer role and a Fulfillment Leader role. And I think that's the role that impressed me with her performance within the, it was a Casing Fulfillment Leader role where there were significant issues within the casing supply chain period. And they tasked two individuals to work on the supply chain and try to help drive our suppliers back to be on track with fulfillment and achieve the quality standards that we anticipate, and, you know, from everything I could see in talking to her past managers, she excelled at that position. And to me, I felt that somebody that's capable of managing vendors, who you have no direct authority over, you know, those corporations or people that you're working with. And her being able to manage that showed me that she had good management skills and that she would be a good fit to be our first shift operations leader.

5

(Charron dep. 17-18).

According to the plaintiff, he informed Mr. Charron in a meeting that he felt the defendant was not focused on diversity as he felt that the decision not to interview him for the position was out of line with what he had been seeing previously at GE (pl. dep. 51). The plaintiff acknowledged during his deposition that he did not mention race during this meeting (*id.* 52). In his affidavit submitted in support of his opposition to the motion for summary judgment, the plaintiff stated that he told Mr. Charron "during a weekly meeting" in 2009 that he believed he "had been discriminated against" (pl. aff. ¶ 35). The plaintiff testified during his deposition that he thought that the discussion with Mr. Charron occurred in June of 2009 (pl. dep. 52-53). In his responses to the defendant's first set of interrogatories, he indicated the discussion took place during the fourth quarter of 2009 (*id.*, ex. 3). The plaintiff testified in his deposition that he also spoke to Mark Debose in Human Resources regarding the defendant's diversity and the decision to give the position to Ms. White (*id.* 141-42). He testified that Mr. Debose told him that there was "something . . . going on" with Ms. White's position and that they thought the Operations Leader position would be a good fit for her (*id.*). The plaintiff testified that he "probably wouldn't have got upset about it" if he had been told this earlier (*id.*). According to the plaintiff's responses to the defendant's first set of interrogatories, the plaintiff had the conversation with Mr. Debose the same day he spoke to Mr. Charron in the fourth quarter of 2009 (*id.*, ex. 3).

George Gramblin, an African-American third shift Operations Leader in Combustion, stated in his affidavit that he believes that the plaintiff felt that Ms. White walked into the first shift Operations Leader position (Gramblin aff. ¶¶ 1, 6). Mr. Gramblin believed that Ms. White's previous roles managing vendors on logistics and quality issues are the type of job duties that prepare someone to be a good supervisor (*id.* ¶ 6), and that it can often be a longer process for a supervisor to move from an off-shift to a first shift position, which has additional responsibilities (*id.* ¶¶ 3, 5). Mr. Gramblin stated that he does not believe that an off-shift supervisor that has only been employed with GE for 12 months can learn enough about the production process to be ready to move to first shift in that short

of a time (*id.* ¶ 4).  Mr. Gramblin stated in his affidavit that he has been in a third shift Operations Leader position for five years, and he feels that he has done a good job in that position.  However, he has not yet felt ready for a first shift supervisor position (*id.* ¶ 8).

Mr. Charron had worked with the plaintiff during the first twelve months of the plaintiff's employment, as Mr. Charron was the first shift Operations Leader prior to being promoted to Cell Leader (Charron dep. 10-11).  Mr. Charron had had issues with the accuracy of the information the plaintiff had been providing him during shift turnover (*id.* 11-12; Charron aff. ¶ 3; pl. dep., ex. 4).  Mr. Charron also had issues with the plaintiff calling certain projects and tasks completed, when in fact, those tasks had not been completed (Charron dep. 11).  According to Mr. Charron, these issues continued once Ms. White became the Operations Leader on the first shift (Charron aff. ¶ 3).  Mr. Charron continued to have problems with the accuracy and consistency of the turnover reports that the plaintiff was providing during the third shift turnover (*id.* ¶¶ 3,7).  He had discussions with the plaintiff about this during the summer of 2009 (pl. dep., ex. 5).  The plaintiff was also behind on his Ravensburg project (*id.*).  Mr. Charron also had issues with the plaintiff not taking care of certain administrative duties with some of his employees, such as transferring employees' time from one department to another, which was impacting his efficiency and productivity ratings (*id.*, ex. 7).

Mr. Charron had a discussion with the plaintiff on June 11, 2009, about an LP part that had not been properly inspected and stamped, which would have been a "huge quality issue" (pl. dep., ex. 6).  The plaintiff also failed to follow proper procedures in running certain compressor parts on September 2, 2009 (*id.*, ex. 8).  The plaintiff also missed meetings with Mr. Charron (Charron dep. 26, 29; pl. dep., ex. 9).  The plaintiff was also late in completing one of his projects and turned in the final information needed for another project by sliding it under the door on December 31, 2009 (pl. dep. 83, ex. 11; Charron aff. ¶ 7).  Turning in projects on the last day is frowned upon by the defendant (White dep. 21).

Mr. Charron had a mid-year discussion with the plaintiff in September 2009 (pl. dep. 72).  During that meeting, Mr. Charron told the plaintiff that he needed to improve

in his third shift turnovers and that he needed to complete his projects on time (*id.*).  Mr. Charron also informed the plaintiff that if he did not improve, he was going to receive a "Development Needed" rating on his 2009 EMS (*id.* 90; Charron aff. ¶ 8).

The plaintiff's job responsibilities changed in the fall of 2009 when he assumed additional responsibilities for third shift in Rotor Assembly (pl. dep. 77; Charron dep. 26).  The third shift Rotor Assembly Operations Leader, Mike Casey, was retiring (pl. dep. 78; Charron aff. ¶ 9).  During this time, the plaintiff reported both to Mr. Charron and Curtis Parker, Cell Leader for third shift Rotor Assembly (pl. dep. 78).  The plaintiff was asked to help out in a transition period with the third shift Rotor Assembly as he was already working third shift Rotor Machining and thus was the logical choice to help out (*id*. 81; Charron dep. 25-26; Parker dep. 7; Charron aff. ¶ 9).

The plaintiff received a "Development Needed" rating on his 2009 EMS (pl. dep., ex. 12).  Mr. Charron noted that the plaintiff needed to have better execution on his projects, seek more opportunities for projects to improve the Cell's metrics, and shift his focus on daily execution and on-time completion of projects (*id.*).  The plaintiff testified that he did not necessarily disagree with the evaluation rating because he understood the need for continuous improvement (*id.* 88).  While the plaintiff's 2009 EMS was completed by Mr. Charron, he did seek input from Mr. Parker as the plaintiff had been reporting to him as third shift Operations Leader in Rotor Assembly for several months prior to the completion of the EMS (*id.* 81; Charron aff. ¶ 9).  Mr. Parker was noticing some of the same issues with the plaintiff that Mr. Charron had been experiencing (Parker aff. ¶ 4).

By the end of January 2010, the plaintiff was working full time in Rotor Assembly (pl. dep. 99; Parker aff. ¶ 10).  Based on the plaintiff's performance issues, Mr. Parker placed the plaintiff on a Performance Improvement Plan ("PIP") on March 25, 2010 (pl. dep. 94, ex. 13).  At that time, the plaintiff was reporting solely to Mr. Parker (Parker aff. ¶ 10).  Mr. Parker laid out specific issues that needed to be improved by June 10, 2010.  Those issues included the following:

•Shift productivity/turnover accuracy.

8

> > •Lack of progress toward timely Six Sigma project closure.
> >
> > •Work product process knowledge.
> >
> > •Active engagement of hourly workforce.
> >
> > •Daily administrative task.

(Pl. dep., ex. 13). The cover letter for the PIP stated that Mr. Parker would "monitor and assess [the plaintiff's] progress in meeting goals in the plan during the duration of the plan," and Mr. Parker would "make a final determination as to what further action may be necessary or appropriate" (*id.*). The plaintiff was instructed that it was his responsibility to set up weekly formal review sessions with Mr. Parker to discuss his progress on the PIP (*id.*). The plaintiff acknowledged that throughout the next several months, Mr. Parker provided feedback to him about his performance (*id.* 101). The plaintiff had a good relationship with Mr. Parker, who is also African-American (*id.* 100).

According to Mr. Parker, during the next several months, the plaintiff failed to show improvement in the areas specifically addressed in the PIP (pl. dep., ex. 14-24; Parker aff. ¶¶ 6-8). Specifically, the plaintiff failed to satisfactorily complete the five issues that were set forth in the PIP, including turning in his Six Sigma project one month late (Parker aff. ¶¶ 6-7). On April 29, 2010, Mr. Parker emailed the plaintiff asking his progress in several areas. Mr. Parker instructed the plaintiff to set up a weekly meeting on the calendar for them to meet (pl. dep., ex. 15). On May 17, 2010, Mr. Parker emailed the plaintiff and reminded him that they had not had a meeting in the past two weeks and that it was "very important" that the plaintiff schedule their weekly progress meetings (*id.*, ex. 16). On June 1, 2010, Mr. Parker emailed the plaintiff regarding his failure to set up weekly meetings to discuss his progress on the PIP. Mr. Parker also noted in the email that he and the plaintiff had discussed that the plaintiff would turn in his Six Sigma project on May 28th, which was originally due on May 14th. Mr. Parker stated that the new due date for the project was June 4th and that the plaintiff needed to "get it done and set up a review . . . on Friday to review your project." Mr. Parker further stated in the email: "During our last discussion, you communicated to me that you did not want to be on the [PIP] any longer and that you

9

wanted to go back to business as usual but you are not showing that in your actions" (*id.*, ex. 20). According to Mr. Parker, the plaintiff had already missed the original May 14, 2010, deadline for the Six Sigma project before he let Mr. Parker know that it would not be completed on time (Parker aff. ¶ 6). The plaintiff knew this Six Sigma project was an important part of the PIP (pl. dep. 124). The plaintiff claims that the project was slowed by his having to work with engineers in India to get it done (*id.* 121-22). The plaintiff acknowledges that when he informed Mr. Parker of his problems, Mr. Parker contacted the quality team and got the plaintiff the information he needed to provide to the engineers in India the next day (*id.*; Parker aff. ¶ 7). The project was completed by the plaintiff and closed in the system on June 22, 2010 (pl. dep. 124, ex. 23). According to Mr. Parker, the plaintiff had not shown a sense of urgency or seriousness demonstrated by the PIP (Parker aff. ¶ 9). Mr. Parker informed the plaintiff on July 16, 2010, that his employment with the defendant was terminated effective on that date (pl. dep., ex. 24).

The plaintiff testified in his deposition that he was "shocked" when he was terminated by Mr. Parker (pl. dep. 126). He believed that the PIP was issued to strengthen his performance, and he did not believe he was at risk of being terminated from employment after receiving the PIP (pl. aff. ¶¶ 42-43). The plaintiff testified in his deposition that he believes Mr. Charron and Mr. Parker were in a conspiracy to terminate his employment because he discussed GE's lack of emphasis on diversity with Mr. Charron after Ms. White was hired as the first shift Operations Leader (pl. dep. 51, 101). The plaintiff testified in his deposition that he feels that the decision not to offer him an interview was based on his race (*id.* 58-59). The plaintiff further feels that Mr. Charron retaliated against him after he mentioned the defendant's diversity to him (*id.* 80). The plaintiff feels that Mr. Parker was just a "puppet" in Mr. Charron's scheme (*id.* 101). The plaintiff acknowledged that he does not have any evidence that Mr. Charron and Mr. Parker conspired with each other to discriminate against him; it was just his personal feeling (*id.*104). Mr. Charron does not remember the plaintiff ever mentioning diversity to him (Charron dep. 20). The plaintiff did not discuss or mention diversity to Mr. Parker, and Mr.

Parker testified that Mr. Charron never informed him the plaintiff had a discussion with him about diversity (Parker dep. 13; Parker aff. ¶ 11). The first Mr. Parker heard of such a conversation was after the instant lawsuit was filed (Parker aff. ¶ 11).

## APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the the the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.

### *Failure to Promote*

The plaintiff first alleges that the defendant failed to promote him to the first shift Operations Leader position based on his race (amended comp. ¶¶ 51, 57).[2] The parties agree that the *McDonnell Douglas* burden-shifting framework is the appropriate method of analysis in this case.[3] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To demonstrate a *prima facie* case of discrimination in a failure to promote context, the plaintiff must show that (1) he is a member of a protected group, (2) he applied for the position in question, (3) he was qualified for the position, and (4) the defendant rejected his application under circumstances that give rise to an inference of unlawful discrimination. *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319 n.6 (4th Cir. 2005) (quoting *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir.2005)).

If the plaintiff can establish a *prima facie* case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-55 (1981) (this is a burden of production, not persuasion). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). In *Reeves*, the Supreme Court reiterated that evidence of pretext, combined with the plaintiff's *prima facie*

---

[2]In his affidavit submitted in opposition to the motion for summary judgment, the plaintiff stated that, during his employment, he witnessed "two different" Caucasian individuals being promoted over him (pl. aff. ¶ 48). Nowhere in his EEOC charge of discrimination, amended complaint, or deposition does the plaintiff ever mention or even reference any job position that he had applied for other than the first shift Operations Leader position in the Spring of 2009. Accordingly, this is the only position that will be considered here.

[3]The court will apply these same standards to the claims under Section 1981. *See Mulvey v. Bellsouth Telecomms., Inc.*, C.A. No. 2:08-3547-MBS-BM, 2010 WL 3782852, at *6 n.11 (D.S.C. July 12, 2010) (stating, "[T]he standards applicable to lawsuits under § 1981 are basically the same standards applicable to lawsuits under Title VII, with the same caselaw being used to evaluate a claim under either statute.") (citations omitted).

case, does not compel judgment for the plaintiff, because "[i]t is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 146-47 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)) (emphasis in original). However, the Court also stated that, under the appropriate circumstances, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id*. It is the plaintiff's burden to create an inference that the defendant's proffered reason is a pretext for intentional discrimination. *See id.* at 147-48. Pretext analysis does not convert Title VII into a vehicle for challenging unfair – but nondiscriminatory – employment decisions. *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir. 1989). Conclusory allegations, without more, are insufficient to preclude the granting of the defendant's summary judgment motion. *Ross*, 759 F.2d at 365.

The defendant argues that the plaintiff cannot establish the fourth element of a *prima facie* case of race discrimination regarding his bid for the first shift Operations Leader position. This court agrees. The plaintiff has presented absolutely no evidence that he was a better qualified applicant to perform the essential functions of the job than Ms. White. Furthermore, as argued by the defendant, it is not even clear that the plaintiff is challenging that Ms. White was a better qualified candidate or that he was denied the position because of his race. Rather, the plaintiff appears to be challenging the decision not to interview him, which he feels may have been racially motivated (pl. dep. 58). The plaintiff testified that he felt he was discriminated against because he was not provided an opportunity for an interview and was not told what he needed to do to advance within GE going forward (*id.* 49). He testified that the "primary reason why we're sitting here [in his deposition]" was because he was not interviewed for the position (*id.*).

The plaintiff has failed to show any evidence that gives rise to an inference of unlawful discrimination with regard to the decision not to interview him for the first shift position. Mr. Charron testified that the plaintiff was not interviewed for the position because he had not excelled in his current position on the third shift, he had been in the third shift

13

position for less than a year, and Mr. Charron and Mr. Stefanik did not feel that the plaintiff was ready to assume the additional responsibilities of a first shift Operations Leader (pl. dep. 43; Charron dep. 18-20; Charron aff. ¶ 5). Importantly, the only other person interviewed for the job other than Ms. White was the second shift Operations Leader, Mr. Weaver, who is African-American.

The plaintiff argues in response to the motion for summary judgment that Ms. White had never served as an Operations Leader, whereas he had "significant experience" as an Operations Leader (pl. resp. m.s.j. 16). This court does not believe that this fact raises an inference of unlawful discrimination. As shown above, the defendant has presented evidence that the plaintiff had not excelled in his third shift Operations Leader position (Charron aff. ¶ 5). Under the "Career Recommendations" section of the plaintiff's 2008 evaluation, Mr. Kenney recommended that the plaintiff "remain in his current role, and work on his development needs" (pl. dep., ex. 2). The plaintiff agreed with Mr. Kenney's overall assessment in the evaluation and does not feel that he was discriminated against with respect to the 2008 evaluation (*id.* 39-40). He also did not disagree with Mr. Kenney's "Career Recommendation" (*id.* 39).

According to Mr. Charron, Ms. White was hired for the position because of her prior roles at GE as a Buyer and a Fulfillment Leader that had prepared her for the role. They felt her performance in these positions, managing the work being performed by employees of GE's vendors, showed that she was capable of managing employees on the first shift in Rotor Machining (Charron dep. 17-18; Charron aff. ¶ 6). Ms. White had received favorable input from her managers, had a top rating on her previous performance evaluations, and had an educational degree from Clemson University that made her the best qualified candidate for the position (Charron dep. 17; White dep. 8, 11). Moreover, Ms. White's job position was going away, and they thought she would be a good fit for the first shift Operations Leader position (pl. dep. 141; White dep. 14).

The defendant has provided legitimate, nondiscriminatory reasons for not interviewing the plaintiff for the first shift Operations Leader position and for hiring Ms.

14

White for the position. Accordingly, the burden shifts to the plaintiff to establish that the defendant's legitimate, nondiscriminatory reasons are "unworthy of credence." *See Reeves*, 530 U.S. at 147.

The plaintiff argues that a material question of fact exists because the defendant has failed to present evidence of when Mr. Weaver was placed in the position of second shift Operations Leader, who hired him for the position, if he competed against other Caucasians for the position, and whether Mr. Parker or Mr. Charron were involved in Mr. Weaver's hiring (pl. resp. m.s.j. 17). The circumstances surrounding Mr. Weaver's placement in his position as a second shift Operations Leader are irrelevant to this case. It is undisputed that Mr. Weaver, who is an African-American, was interviewed for the first shift Operations Leader position at issue here and that Mr. Charron and Mr. Stefanik chose which candidates to interview (Hill dep. 8). The plaintiff argues that the defendant's reliance on this fact is misplaced because an African-American was not ultimately selected for the first shift Operations Leader position (pl. resp. m.s.j. 18). However, this fact is clearly relevant to the plaintiff's claim that he was not selected for an interview based on his race. The fact that Mr. Weaver *was* interviewed is evidence that race was not a factor in the decision not to interview the plaintiff for the position.

The plaintiff acknowledged that the first shift supervisor was expected "to understand what was going on in the operation more so because they were attending meetings. They were attending group discussions" (pl. dep. 26). The plaintiff further testified that he did not disagree with his evaluation at the end of 2008, approximately four months before he applied for the first shift Operations Leader position, which recommended that he stay in his present position and work on his development needs (*id.* 29). Moreover, the plaintiff testified that Mr. Weaver "likely" had more knowledge or experience than he did in the process in Rotor Machining. He also could not say that he was more qualified for the job than Mr. Weaver because Mr. Weaver had worked for the defendant for four years and "seniority . . . would have its place" (*id.* 47).

The evidence is uncontradicted that the defendant's policies were followed in the interviews conducted for the first shift Operations Leader opening in Rotor Machining (Hill dep. 8). Further, George Gramblin, an African-American third shift Operations Leader in Combustion, has stated that he does not believe that an off-shift supervisor who has only been employed with the defendant for 12 months could have learned enough about the production process to be ready to move to first shift in such a short amount of time (Gramblin aff. ¶4). The plaintiff also has not rebutted evidence that Ms. White had the educational experience for the position, she had the highest evaluation scores, and she had been indirectly supervising employees of the defendant's suppliers for the previous two years (Charron dep. 17-18; Charron aff. ¶ 6).

Based upon the foregoing, the plaintiff has failed to show that the defendant's reasons for not interviewing him and for selecting Ms. White for the position are unworthy of credence. His subjective belief that he was discriminated against based on his race is insufficient to defeat a valid motion for summary judgment. *Williams v. Giant Food, Inc.*, 370 F.3d 423, 433 (4th Cir. 2004). Accordingly, summary judgment should be granted on the plaintiff's failure to promote claims.

*Retaliation*

The plaintiff further alleges that the defendant placed him on the PIP and ultimately terminated his employment based upon his discussion of "diversity issues" with management (amended comp. ¶¶ 27, 29-37). To establish a *prima facie* case of retaliation, a plaintiff must prove that (1) he engaged in a protected activity, (2) the employer acted adversely against him, and (3) there was a causal connection between the protected activity and the asserted adverse action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011). "If a plaintiff 'puts forth sufficient evidence to establish a *prima facie* case of retaliation' and a defendant 'offers a non-discriminatory explanation' for his termination, the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Id.* (quoting *Yashenko v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2006)).

The plaintiff testified that he told Mr. Charron in a meeting that he felt the defendant was not focused on diversity as he felt that the decision not to interview him for the first shift Operations Leader position was out of line with what he had been seeing previously at GE (pl. dep. 51). The plaintiff acknowledged during his deposition that he did not mention race during this meeting (*id.* 52). In his affidavit submitted in support of his opposition to the motion for summary judgment, the plaintiff stated that he told Mr. Charron "during a weekly meeting" in 2009 that he believed he "had been discriminated against" (pl. aff. ¶ 35). The plaintiff testified during his deposition that he thought that the discussion with Mr. Charron occurred in June of 2009 (pl. dep. 52-53). In his responses to the defendant's first set of interrogatories, he indicated the discussion took place during the fourth quarter of 2009 (*id.*, ex. 3). The plaintiff testified in his deposition that he also spoke to Mark Debose in Human Resources regarding the defendant's diversity and the decision to give the Operations Leader position to Ms. White (*id.* 141-42).[4]

Assuming for purposes of this motion that the foregoing discussions with management constitute "protected activity," the plaintiff has failed to show a causal connection between such activity and the issuance of the PIP and his ultimate termination from employment by Mr. Parker. The plaintiff believes that Mr. Charron and Mr. Parker were in a conspiracy to terminate his employment because he discussed the defendant's lack of emphasis on diversity with Mr. Charron after Ms. White was hired as the first shift Operations Leader (pl. dep. 52, 101). The plaintiff testified that he feels Mr. Parker was just a "puppet" in Mr. Charron's scheme (*id.* 101). However, the undisputed evidence before this court is that Mr. Charron never informed Mr. Parker that the plaintiff had a conversation with him about diversity (Parker aff. ¶ 11). The plaintiff also has not presented evidence that Mr. Parker knew of his discussion with Mr. Debose. The plaintiff argues that "one

---

[4] In his response in opposition to the motion for summary judgment, the plaintiff argues that he "informed the Defendant on at least three different occasions that the Plant lacked diversity" (pl. resp. m.s.j. 22). The response does not specify to whom other than Mr. Charron and Mr. Debose the plaintiff complained. In his affidavit, the plaintiff stated that he "had twice complained that the plant lacked diversity" (pl. aff. ¶ 44). Accordingly, it appears that the reference to three complaints is in error.

individual [Mr. Parker] claiming they were not aware of it does not negate the Plaintiff's claim or suffice to render the Defendant innocent of the acts of retaliation" (pl. resp. m.s.j. 23). However, it is undisputed that it was Mr. Parker who placed the plaintiff on the PIP and later terminated his employment. "Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the *prima facie* case." *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998) (citations omitted).

Moreover, the plaintiff has failed to show that the defendant's explanation for putting him on the PIP and for terminating his employment was pretext for retaliation. At the time the plaintiff was placed on the PIP in March 2010, he was reporting solely to Mr. Parker (Parker aff. ¶ 10). During the first several months of the plaintiff's employment in Rotor Assembly, Mr. Parker noticed some performance issues with the accuracy of the information the plaintiff provided during his shift turnover meetings and with some of his product and operation knowledge (*id.* ¶ 4). In the March 2010 PIP, Mr. Parker set forth five specific areas that needed to be improved over the next several months (pl. dep., ex. 13). The defendant has presented evidence showing that the plaintiff failed to satisfactorily improve in these areas as set forth in detail above (Parker aff. ¶¶ 6-8; pl. dep., ex. 14-24). While the plaintiff argues that he did in fact complete "all aspects of the PIP" (pl. resp. m.s.j. 24), he submitted absolutely no evidence supporting this claim. The plaintiff argues that the fact that the PIP does not state that he would be terminated if he failed to complete it is evidence of pretext (*id.*). The plaintiff has brought an intentional race discrimination claim under Title VII. He has not brought a common law wrongful discharge claim or breach of contract claim based on the defendant's alleged failure to follow certain policies and procedures. This court agrees with the defendant that the mere fact that the PIP did not state that failure to successfully complete the PIP would result in termination is not material to the ultimate finding of retaliation in this case. Thus, it cannot support a finding of pretext

to defeat the defendant's legitimate non-retaliatory reasons for placing the plaintiff on the PIP and terminating his employment.

Based upon the foregoing, summary judgment should be granted on the plaintiff's retaliation claims.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, this court recommends that the defendant's motion for summary judgment (doc. 27) be granted.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 4, 2013
Greenville, South Carolina