IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| James Jones, | ) | |
| | ) | C.A. No. 6:11-2693-HMH-KFM |
| Plaintiff, | ) | |
| | ) | **OPINION & ORDER** |
| vs. | ) | |
| | ) | |
| GE Gas Turbines (Greenville), LLC, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court with the Report and Recommendation of United States Magistrate Judge Kevin F. McDonald, made in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 of the District of South Carolina.[1] James Jones ("Jones") alleges race discrimination and retaliation claims against GE Gas Turbines (Greenville), LLC ("GE") under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000(e), et seq., and 42 U.S.C. § 1981. GE filed a motion for summary judgment on July 6, 2012. Magistrate Judge McDonald recommends granting GE's motion for summary judgment. Jones filed objections to the Report and Recommendation. After review, the court adopts the magistrate judge's Report and Recommendation and grants GE's motion for summary judgment.

---

[1] The magistrate judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with this court. See Mathews v. Weber, 423 U.S. 261, 270-71 (1976). The court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions. See 28 U.S.C. § 636(b)(1).

1

## I. Factual and Procedural History

Jones, an African American male, began his employment as the third shift Operations Leader in Rotor Machining with GE in April 2008. (Def. Mem. Supp. Summ. J. Attach. 1 (Pl. Dep. 19-20), ECF No. 27-2.) Rotor Machining is one division, or bay, of the Rotor Cell, which also includes three other bays: Rotor Assembly, Blades, and Buckets. (Id. Attach 1 (Pl. Dep. 22), ECF No. 27-2.)

GE operates three separate shifts. (Id. at 2-3, ECF No. 27-1.) During each shift, each bay has a shift Operations Leader. (Id.) Every shift Operations Leader reports directly to a Cell Leader, who oversees a bay on all three shifts. (Id. at 3.) The Cell Leader, in turn, reports to the COE Leader, who is responsible for the entire Rotor Cell department. (Def. Mem. Supp. Summ. J. 3, ECF No. 27-1.) As an Operations Leader, Jones attended shift turnover meetings immediately before and after his shift. (Id. Attach. 1 (Pl. Dep. 28), ECF No. 27-2.) At the shift turnover meetings, the incoming shift Operations Leader is advised of any problems or issues that occurred on the previous shift. (Id. at 3, ECF No. 27-1.)

In addition to his role in shift turnover meetings, Jones was responsible for supervising hourly employees, ensuring satisfaction of production goals, and completing a certain number of annual projects. (Id. Attach. 1 (Pl. Dep. 23, 31), ECF No. 27-2.) During his first year of employment, Jones' Cell Leader was John Kenney ("Kenney"). (Id. Attach. 1 (Pl. Dep. 30), ECF No. 27-2.) As his Cell Leader, Kenney prepared Jones' 2008 performance evaluation. (Def. Mem. Supp. Summ. J. Attach. 1 (Pl. Dep. 7), ECF No. 27-3.) In the evaluation, Kenney documented that Jones needed to increase his process knowledge and develop a better understanding of the entire operation. (Id. Attach. 1. (Pl. Dep. 5), ECF No. 27-3.) Jones affirmed

that Kenney's assessment was consistent with his personal assessment of his performance at year end 2008. (Id. Attach. 1 (Pl. Dep. 38-39), ECF No. 27-2.)

In spring 2009, Kenney was promoted to COE Leader in another department, and Guillaume Charron ("Charron"), the first shift Operations Leader in Rotor Machining, was promoted to Cell Leader to fill his vacancy. (Id. at 5, ECF No. 27-1.) Jones applied for the first shift Operations Leader position to replace Charron. (Id.) In accordance with GE policy, Charron, the Cell Leader, and Ed Stefanik ("Stefanik"), the COE Leader of the Rotor Cell department, were charged with hiring Charron's replacement. (Def. Mem. Supp. Summ. J. 5, 7, ECF No. 27-1.)

According to GE, the first shift Operations Leader has additional responsibilities compared to the second and third shift Operations Leaders, because the first shift Operations Leader is responsible for being aware of all of the Rotor Cell department's ongoing operations. (Id. at 2-3.) Further, unlike the second and third shifts, the first shift Operations Leader has greater contacts with personnel and is consistently involved with the other three bays that impact the entire Rotor Cell operation. (Id.) Three individuals applied for the first shift Operations Leader position: Jones, Greg Weaver ("Weaver"), and Ashley White ("White"). (Id. at 6.) Weaver, an African American male, was the second shift Operations Leader in Rotor Machining and had been employed by GE for four years. (Id. at 7, 21.) White, a Caucasian female, was an honors graduate from Clemson University with a degree in industrial engineering and a minor in mathematics. (Def. Mem. Supp. Summ. J. 6, ECF No. 27-1.) White was first employed by GE for approximately two years as a buyer for casings, bearings, and fabrications, primarily working with global vendors. (Id.) She was promoted to Casings Fulfillment Leader for approximately a

year, traveling on site to suppliers and vendors to review and assist them with their internal scheduling problems.  (Id.)  Charron and Stefanik only interviewed Weaver and White for the position.  (Id. at 7.)  According to GE, they did not interview Jones because of his brief one-year tenure with the company and Kenney's 2008 evaluation indicating that he remain in his current role.  (Id. at 5.)  GE alleges that Jones needed additional time in his third shift position before attempting the additional responsibilities associated with the first shift position.  (Def. Mem. Supp. Summ. J. 5, ECF No. 27-1.)  Charron and Stefanik hired White to fill the position.  (Id.)  According to Charron, White was selected based on her educational experience, past performance evaluation ratings, and experience as a Casings Fulfillment Leader dealing with suppliers and supervising others.  (Id. Attach. 7 (Charron Aff. ¶ 8), ECF No. 27-10.)

Jones argues that he was unjustifiably denied the opportunity to interview for the position because of his race.  (Id. Attach. 1 (Pl. Dep. 49, 51), ECF No. 27-2.)  He informed Charron that he believed GE was not sufficiently focused on diversity.  (Id. Attach. 1 (Pl. Dep. 51), ECF No. 27-2.)  Jones also discussed the lack of diversity focus with Mark Debose ("Debose") in Human Resources.  (Def. Mem. Supp. Summ. J. Attach. 1 (Pl. Dep. 141), ECF No. 27-2.)

Jones had these discussions while continuing to work as the third shift Operations Leader, where he reported to Charron as the Cell Leader.  (Id. at 8, ECF No. 27-1.)  According to GE, throughout 2009, Jones failed to improve the accuracy of information he reported at shift turnover meetings.  (Id. Attach. 7 (Charron Aff. ¶ 3), ECF No. 27-10.)  In addition, GE alleges that Jones' projects were consistently overdue and he did not adequately perform certain administrative duties, such as transferring employees' time from one department to another.  (Id. Attach. 7 (Charron Aff. ¶ 7), ECF No. 27-10.)  Charron counseled Jones about his performance issues, and

explicitly informed him of his deficiencies at a mid-year discussion in August 2009. (Id. Attach. 7 (Charron Aff. ¶ 8), ECF No. 27-10.) Charron informed Jones that if he did not improve, he would receive a "Development Needed" rating on his 2009 performance evaluation. (Def. Mem. Supp. Summ. J. Attach. 7 (Charron Aff. ¶ 8), ECF No. 27-10.)

During a transition period in fall 2009, Jones became the third shift Operations Leader in Rotor Assembly, in addition to his responsibilities as the third shift Operations Leader in Rotor Machining. (Id. Attach 7 (Charron Aff. ¶ 9), ECF No. 27-10.) Upon assuming these additional responsibilities, Jones began reporting to Curtis Parker ("Parker"), Cell Leader for Rotor Assembly. (Id. Attach. 7 (Charron Aff. ¶ 9), ECF No. 27-10.) Charron completed Jones' 2009 performance evaluation after consultation with Parker, who indicated that Jones continued to have deficiencies in his work. (Id. Attach. 7 (Charron Aff. ¶ 9), ECF No. 27-10; Id. Attach. 8 (Parker Aff. ¶ 8), ECF No. 27-11.) Jones received a "Development Needed" evaluation. (Pl. Resp. Opp'n Mot. Summ. J. Ex. 1 (Pl. Aff. 15), ECF No. 28-1.)

At the end of January 2010, Jones began working solely as the third shift Operations Leader in Rotor Assembly. (Def. Mem. Supp. Summ. J. Attach. 8 (Parker Aff. ¶ 10), ECF No. 27-11.) Thus, Jones no longer reported to Charron, and reported only to Parker, an African American. (Id. Attach. 8 (Parker Aff. ¶ 1, 10), ECF No. 27-11.) According to GE, Jones persistently exhibited the same deficiencies, finishing projects late and failing to improve the accuracy of his reporting at shift turnover meetings. (Id. Attach. 8 (Parker Aff. ¶ 8-9), ECF No. 27-11.) Parker placed Jones on a Performance Improvement Plan ("PIP") on March 25, 2010. (Id. Attach. 1 (Pl. Dep. 10), ECF No. 27-4.) The PIP detailed five specific issues to address. (Id. Attach. 1 (Pl. Dep. 11), ECF No. 27-4.) The cover letter for the PIP stated that Parker "would

monitor and assess [Jones'] progress in meeting goals in the plan during the duration of the plan," and then he "would make a final determination as to what further action may be necessary or appropriate." (Def. Mem. Supp. Summ. J. Attach. 1 (Pl. Dep. 10), ECF No. 27-4.) In addition, on April 29, 2010, Parker e-mailed Jones instructing him to schedule weekly meetings with him. (Id. Attach. 1 (Pl. Dep. 16), ECF No. 27-4.) GE argues that Jones often neglected to schedule meetings and Parker had to remind Jones of this requirement. (Id. Attach. 1 (Pl. Dep. 18), ECF No. 27-4.) Further, Jones completed a project more than one month overdue. (Id. Attach. 1 (Pl. Dep. 32), ECF No. 27-4.) On July 16, 2010, Parker informed Jones that his employment with GE was terminated. (Id. at 12, ECF No. 27-1.)

After his termination, Jones filed the instant case against GE in the Greenville County Court of Common Pleas on August 3, 2011. The case was removed to this court by GE pursuant to 28 U.S.C. § 1441(a) on October 5, 2011. Jones filed an amended complaint with the court on October 11, 2011, alleging race discrimination and retaliation in violation of Title VII and 42 U.S.C. § 1981.

## II. Discussion of the Law

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether a genuine issue of material fact exists, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry

of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

A litigant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Monahan v. County of Chesterfield, 95 F.3d 1263, 1265 (4th Cir. 1996). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Ballenger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987).

### B. Objections to the Amended Report and Recommendation

Objections to the Report and Recommendation must be specific. Failure to file specific objections constitutes a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the district judge. See United States v. Schronce, 727 F.2d 91, 94 & n.4 (4th Cir. 1984). In the absence of specific objections to the Report and Recommendation of the magistrate judge, the court is not required to give any explanation for adopting the recommendation. See Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983).

Upon review, Jones submits two specific objections to the magistrate judge's Report and Recommendation. First, Jones alleges that the magistrate judge erred in finding that there is no inference of unlawful discrimination when GE did not interview him for the position, because he "had significantly more experience in management and supervision of employees" than White. (Pl. Objections 5, ECF No. 35.) Second, Jones argues that a causal connection exists between his

diversity complaints and his termination, because "it is clear that everyone knew of [his] complaints regarding diversity" and he suffered an adverse employment action. (Id. at 6-7.)

### 1. Race Discrimination

Jones alleges that he was denied a promotion to become the first shift Operations Leader in Rotor Machining because of his race in violation of Title VII and 42 U.S.C. § 1981. (Am. Compl. ¶¶ 51, 57, ECF No. 9.) "These statutes impose identical requirements to evaluate race discrimination claims[,]" and are properly analyzed together. Harris v. Home Sales Co., No.11-1313, 2012 WL 6217613, at *4 (4th Cir. Dec. 12, 2012) (unpublished). To demonstrate a prima facie case of racial discrimination in a failure to promote context, Jones must show by a preponderance of the evidence: "(1) [he] is a member of a protected group, (2) [he] applied for the position in question, (3) [he] was qualified for that position, and (4) the defendant[] rejected [his] application under circumstances that give rise to an inference of unlawful discrimination." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005).

After establishing a prima facie case, "the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the decision not to promote." Id. (internal quotation marks omitted). If GE demonstrates a legitimate, nondiscriminatory reason for its decision, Jones must then show that GE's stated reason is mere pretext for unlawful discrimination. Id. "The plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against [him]." Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

It is undisputed that Jones is an African American male and that he applied to interview for the Rotor Machining first shift Operations Leader position. (Am. Comp. ¶¶ 3, 23, ECF No. 9.)

Jones contends that because he was the most qualified applicant, his application was rejected by GE under circumstances giving rise to an inference of unlawful discrimination. (Id. ¶¶ 51, 52, 57.) The court disagrees.

When Jones applied for the position in spring 2009, Jones was employed by GE as the Rotor Machining third shift Operations Leader. (Def. Mem. Supp. Summ. J. Attach. 1 (Pl. Dep. 40), ECF No. 27-2.) Although in this capacity he supervised employees, completed projects, ensured satisfaction of production goals, and attended shift turnover meetings, Jones had only worked for GE for approximately one year. (Id. at 3, 5, ECF No. 27-1.) Jones' employment duration with GE was far less than that of Weaver and White. Weaver had been employed with GE for four years. (Id. Attach. 1 (Pl. Dep. 47), ECF No. 27-2.) White had been employed by GE for approximately three years. (Id. Attach. 5 (White Dep. 40), ECF No. 27-8.) Charron testified that employment duration with GE was critically important to him in making the decision. (Id. Attach. 2 (Charron Dep. 19-20), ECF No. 27-5.) Jones admitted during testimony that he believed "seniority . . . would have its place." (Def. Mem. Supp. Summ. J. Attach. 1 (Pl. Dep. 47), ECF No. 27-2). Notably, George Gramblin, an African American third shift Operations Leader in Combustion, had worked for GE for five years at that time and did not feel qualified for the first shift supervisor position because "[s]upervisors on first shift have more responsibilities and more is expected out of them than off-shift supervisors." (Id. Attach. 6 (Gramblin Aff. ¶¶ 3, 8), ECF No. 27-9.) Gramblin stated he "d[id] not believe that anybody who has been employed in an off-shift supervisor position only 12 or 13 months would be ready for a first-shift position." (Id. Attach. 6 (Gramblin Aff. ¶ 4), ECF No. 27-9.)

In addition to being relatively inexperienced, Jones' work assessments reflected performance deficiencies. According to his 2009 performance evaluation, his then-Cell Leader, Kenney, documented that Jones needed to "increase his process knowledge" and "gain a better understanding of the entire business." (Id. Attach. 1 (Pl. Dep. 5), ECF No. 27-3.) Jones himself admitted that he needed to "[i]ncrease knowledge of product past performance issues and capabilities." (Id. Attach. 1 (Pl. Dep. 4), ECF No. 27-3.) Kenney further recommended "that James [Jones] remain in his current role, and work on his development needs." (Def. Mem. Supp. Summ. J. Attach. 1 (Pl. Dep. 5), ECF No. 27-3.)

In determining whether to interview Jones, Charron and Stefanik considered the duration of Jones' employment and his past performance. Charron stated that "[w]hile third shift met production goals and had a good safety record, Mr. Jones continually struggled with the inaccuracies in his shift turnover meetings, completing his Six Sigma projects, and performing other administrative duties which were critical to his role as a supervisor." (Id. Attach. 7 (Charron Aff. ¶ 7), ECF No. 27-10.) Alternatively, White had excelled in her role as Casings Fulfillment Leader and was highly recommended by her past managers. (Id. Attach. 2 (Charron. Dep. 17-18), ECF No. 27-5.) White's experience with managing vendors convinced Charron "that she had good management skills and that she would be a good fit to be [GE's] first shift Operations Leader." (Id. Attach 2 (Charron Dep. 18), ECF No. 27-5.) According to Charron, he and Stefanik decided not to interview Jones to avoid any misrepresentation when they "had determined that he was not yet ready to accept the responsibility of [the] position." (Id. Attach. 7 (Charron Aff. ¶ 5), ECF No. 27-10.)

Although Jones is a member of a protected group and applied for the position in question, there is no evidence to suggest that he was the most qualified applicant for the first shift Operations Leader position. Jones had the least amount of experience of the three applicants, and White's performance was superior to his. Additionally, Jones is unable to identify any instances aside from the opportunity to interview in which he was allegedly mistreated by GE due to his race. Jones admits that he did not disagree with his 2008 performance evaluation, and that he did not feel discriminated against with respect thereto. (Def. Mem. Supp. Summ. J. Attach. 1 (Pl. Dep. 39-40), ECF No. 27-2.) Thus, Jones has failed to demonstrate that GE rejected his application under circumstances that give rise to an inference of unlawful discrimination.

Further, GE has provided legitimate, nondiscriminatory reasons for selecting White as the first shift Operations Leader. As discussed above, White had three years of experience with GE at the time the position became available and had worked in two different capacities. She had received excellent past performance ratings and had prior experience supervising individuals in her capacity as Casings Fulfillment Leader. Alternatively, Jones only had one year of experience at the time he applied for the position. He had notable development needs on his performance evaluation, to which he did not disagree. Jones has made no showing that GE's purported reasons for not interviewing him are unworthy of credence or are mere pretext for unlawful discrimination. Moreover, the second candidate selected to be interviewed, Weaver, is also African American, which further indicates that GE did not have any discriminatory animus in deciding not to interview Jones for the position. Based on the foregoing, the court grants summary judgment on behalf of GE on the Plaintiff's race discrimination claim.

## 2. Retaliation

Jones next alleges retaliation in violation of Title VII and § 1981 against GE, claiming that his transfer, discipline, and termination "were directly related to [his] previous complaints regarding discrimination." (Am. Compl. ¶ 65, ECF No. 9.) These statutes are properly analyzed together as they impose identical standards. See Harris, 2012 WL 6217613, at **4, 7. In his Report and Recommendation, Magistrate Judge McDonald further recommends granting GE's motion for summary judgment on Jones' retaliation claim.

Jones asserts that there is sufficient evidence to support his retaliation claim. "In order to establish a *prima facie* case of retaliation, [Jones] must prove three elements: first, that []he engaged in protected activity; second, that an adverse employment action was taken against h[im]; and third, that there was a causal link between the protected activity and the adverse employment action." Mackey v. Shalala, 360 F.3d 463, 469 (4th Cir. 2004). "[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004).

Similar to a race discrimination claim in a failure to promote context, if an employee establishes a prima facie case of retaliation, then the burden shifts to the employer "to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007). If the employer meets this burden of production, then "the burden shifts back to [Jones] to show that the reason is mere pretext for retaliation by proving both that the reason was false, and that discrimination was the real reason for the challenged conduct." Id. (internal quotation marks omitted).

Jones complained to both Charron and Debose regarding the decision not to interview him for the first shift Operations Leader position and to hire White. (Def. Mem. Supp. Summ. J. Attach. 1 (Pl. Dep. 52-53, 141-42), ECF No. 27-2.) In these conversations, Jones expressed his dissatisfaction and his belief that the decisions were inconsistent with GE's diversity policy. (Id. Attach. 1 (Pl. Dep. 52-53, 141-42), ECF No. 27-2.) Jones now asserts that because of his complaints, GE retaliated against him by terminating his employment. (Am. Compl. ¶ 65, ECF No. 9.)

It is undisputed that Jones was actually terminated by Parker, not Charron or Debose. (Def. Mem. Supp. Summ. J. Attach. 1 (Pl. Dep. 34), ECF No. 27-4. ) Jones never discussed diversity issues with Parker, and Parker alleges that he was unaware of Jones' discussions with either Charron or Debose. (Id. Attach. 1 (Pl. Dep. 142), ECF No. 27-2; Id. Attach. 8 (Parker Aff. ¶ 11), ECF No. 27-11.) Jones argues that Charron and Parker conspired together to terminate his employment. (Id. Attach. 1 (Pl. Dep. 101), ECF No. 27-2.) Jones asserts that although he never discussed his diversity concerns with Parker, it was clear that "everyone knew of [his] complaints regarding diversity." (Pl. Objections 6, ECF No. 35.) Conclusory allegations, however, are insufficient to create a genuine issue of material fact. See Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) ("Conclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' in support of [the non-moving party's] case."). Moreover, "[k]nowledge alone . . . does not establish a causal connection between [Jones'] protected activity and [GE's] decision [] to [terminate] him." Price, 380 F.3d at 213. Thus, Jones is unable to demonstrate a causal connection between his comments, the issuance of the PIP, and, ultimately, his termination.

Further, GE has provided several legitimate, nondiscriminatory reasons for its decision to terminate Jones. The Plaintiff argues that he "was not warned that he would be terminated even during the PIP." (Pl. Objections 6, ECF No. 35.) Jones also alleges, without substantiation, that he "completed all aspects of the PIP." (Id.) GE directly contradicts this allegation with evidence clearly demonstrating that Jones failed to improve on his administrative tasks, continued finishing his projects behind schedule, and neglected to set up meetings with Parker to discuss his performance-related issues. (Def. Mem. Supp. Summ. J. Attach 1. (Pl. Dep. 20, 26, 32), ECF No. 27-4.) Thus, there is no evidence to support a finding that GE's proffered reasons for terminating Jones are pretextual. Based on the foregoing, the court finds that GE is entitled to summary judgment on the retaliation claim. Therefore, the court adopts the magistrate judge's Report and Recommendation.

Therefore, it is

**ORDERED** that GE's motion for summary judgment, docket number 27, is granted.

**IT IS SO ORDERED**.

s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
February 12, 2013